## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| MATINA KOESTER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 4:14CV1772 RLW |
| | ) |
| YOUNG MEN'S CHRISTIAN | ) |
| ASSOCIATION OF GREATER | ) |
| ST. LOUIS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No.

125) and Plaintiffs' Motion for Summary Judgment (ECF No. 129). The motions are fully

briefed and ready for disposition.

## I. Background

On October 20, 2014, Plaintiffs Matina Koester and her minor child, N.K., filed a

Complaint for Injunctive Relief against Defendant Young Men's Christian Association of

Greater St. Louis ("YMCA"), alleging discrimination in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). (Compl., ECF No. 1) N.K. has Down

syndrome and an educational diagnosis of Autism. (Pls.' Statement of Uncontroverted Material

Facts ("SUMF") ¶ 1, ECF No. 131) He is an individual with a disability within the meaning of

Title III of the ADA. (*Id.*) Defendant YMCA is a place of public accommodation within the

meaning of the ADA. (*Id.* at ¶ 2) According to the YMCA Summer Camp Family Handbook,

the YMCA provides children with enriching, creative, recreational activities that enhance self-

esteem and life-long learning, and it welcomes participation by children with all abilities.

(Def.'s Statement of Uncontroverted Material Facts ("SUMF") ¶¶ 2-3, ECF No. 127) The

Family Handbook further states:

> The Y provides a recreational environment for children with and without
> disabilities through added support staff, when needed, to facilitate successful
> participation in programs, when appropriate. If your child has an an
> Individualized Education Plan (IEP) and/or Behavior Management Plan (BMP),
> or a 504 Accommodation Plan, a copy must be given to the Center Director with
> additional required paperwork to be reviewed before participation is authorized.

(Def.'s SUMF ¶ 5; YMCA Summer Camp 2015 Family Handbook, Def.'s Ex. C p. 11, ECF No.

127-4) The YMCA's recreational activities include sports activities and summer camp

programs. (Def.'s SUMF ¶¶ 9-10) While sports activities, which last less than an hour, do not

require an Individualized Education Plan ("IEP") for children with disabilities to participate, the

YMCA does require submission of an IEP for summer camp participation. (*Id.* at ¶¶ 7-11)

YMCA summer camp programs involve the YMCA having sole custody of a child for an

average of eight to ten hours a day, five days a week, for each week a child is enrolled. (*Id.* at ¶

9) Traditional summer camps include activities such as arts and crafts, sports, group games,

nature exploration, swimming, and field trips. (Pls.' SUMF ¶ 4; Summer Camp 2015 Brochure,

Pls.' Ex. D pp. 4-6, ECF No. 131-4) Enrollment in the YMCA Summer Camp is not complete

until all forms have been completed in full and returned. (Def.'s SUMF ¶ 6) The purpose of the

IEP is to allow the YMCA to determine reasonable and necessary accommodations for children

with disabilities. (*Id.* at ¶ 7) The YMCA serves tens of thousands of children each summer

through its summer camp programs and provides accommodations for at least seven hundred

children with documented disabilities. (*Id.* at ¶ 1)

In May 2014, Plaintiff Matina Koester sought to enroll N.K. in Defendant's summer

camp at the Kirkwood Family YMCA facility. (Pls.' SUMF ¶ 3) She called the Kirkwood

YMCA to inquire about registration and to request an accommodation for N.K. to allow him to

2

participate in YMCA summer camp. (Pls.' SUMF ¶ 5; Def.'s SUMF ¶ 32) The Director of Inclusive Services, Dawn Goetz, informed Ms. Koester that Defendant required a copy of N.K.'s Individualized Education Plan ("IEP") to determine appropriate accommodations. (Pls.' Compl. ¶¶ 12-13; Def.'s SUMF ¶ 51; Goetz Decl., Def.'s Ex. F ¶ 2, ECF No. 127-7) Ms. Koester objected to providing N.K.'s IEP because she believed the document was highly personal and confidential. (Compl. ¶ 13; Def.'s SUMF ¶ 23) While Ms. Koester offered to engage in an interactive process by sitting down to discuss what accommodations would be reasonable for N.K., Ms. Koester did not give Ms. Goetz an opportunity to provide Plaintiff with the YMCA's alternative categories of information it was willing to accept in lieu of an IEP at that time. (Goetz Dep., Pls.' Ex. C 225:15-226:16, ECF No. 131-3; Def.'s SUMF ¶¶ 33, 35) Ms. Koester did not fill out an application or submit paperwork to enroll N.K. in the YMCA's summer camp. (Def.'s SUMF ¶ 31)

The YMCA believes that the IEP is the most effective and efficient source of information because it is already available to parents and works well to allow the YMCA to develop accommodations. (Goetz Dep., Def.'s Ex. B 161:6-162:5, ECF No. 127-3) While IEPs contain some information not needed to accommodate disabled children, the YMCA uses the IEP information to provide support for the children so they may be successful and remain in camp. (Goetz Dep., Def.'s Ex. B 58:3-11; Goetz Dep., Pls.' Ex. C 55:16-22) Further, the YMCA believes the IEPs help accommodate disabled children to keep them safe, keep other children safe, and allow them to have fun and reach their maximum potential. (Rugo Dep., Def.'s Ex. E 45:16-20, ECF No. 127-6)

On October 17, 2014, the YMCA offered to make an exception to the YMCA's IEP policy in a letter from Defendant's counsel. (Pls.' SUMF ¶ 9; Def.'s SUMF ¶ 52) This

3

exception included information related to the IEP from N.K.'s pediatrician, Dr. Plax, regarding N.K.'s behavior, speech, fine/gross motor functioning and cognitive functioning, areas of strength and weakness, toileting information, behavioral triggers, dietary restrictions, ability to interact with peers and adults, and ability to follow directions. (Pls.' SUMF ¶ 9; Def.'s Ex. G, ECF No. 127-8) Dr. Plax testified that N.K. had difficulty with communication and relating socially. (Plax Dep., Def.'s Ex. J 27:17-22, 32:19-24, ECF No. 127-11) Dr. Plax believed that N.K.'s limited speech ability placed a significant limitation on his ability to function daily. (*Id.* at 35:7-12) He also believed that N.K. required more structure and one-on-one supervision in a camp setting. (*Id.* at 39:8-13, 50:10-52:9) In addition, Dr. Plax had concerns over N.K.'s safety based on his limited ability to communicate and the safety of others because N.K.'s behavior toward other children could be unpredictable. (*Id.* at 47-:24-48:7)

Ms. Koester testified that she would have been willing to let the YMCA know that N.K. did not require one-on-one supervision but just an extra set of eyes. (Def.'s SUMF ¶ 35; Koester Dep., Def.'s Ex. I 70:12-71:6, ECF No. 127-10) Later in her deposition, Ms. Koester stated that she was pretty much seeking a one-on-one accommodation. (Pls.' SUMF ¶ 13; Koester Dep., Pls.' Ex. A 146:25-147:14, ECF No. 131-1) She believed that N.K.'s special needs were minor, requiring someone to help him stay focused and stay with the group a little bit. (Koester Dep., Def.'s Ex. I 37:20-38:7) In addition, Ms. Koester stated that N.K. saw a speech therapist to work out a little bit of a stutter and that he could communicate clearly to make his needs known. (*Id.* at 151:19-23, 190:16-191:25) Further, she testified that N.K. was not prone to wander away, and he had not thrown any tantrums since he was a toddler. (*Id.* at 218:8-11, 232:9-11)

Lisa Jimas supervised N.K. for two of a six-week T-ball program at the YMCA. (Jimas Dep., Pls.' Ex. I 61:5-24) She stated that Ms. Koester was always present and frequently

4

intervened. (*Id.* at 62:2-8, 64:12-15) In addition, Ms. Jimas testified that N.K. would try to run away. (*Id.* at 63:8-14) She also stated that N.K. threw tantrums by screaming, yelling, and sometimes getting on the ground and kicking. (Jimas Dep., Def.'s Ex. K 71:6-14, ECF No. 127-12) Ms. Jimas recalled that N.K. was not verbal and would only grunt; he sometimes dropped F-bombs when speaking with his mom. (*Id.* at 84:21-85:1) Ms. Jimas never heard N.K. speak sentences. (*Id.* at 86:22-23)

In their Complaint, Plaintiffs allege that, so long as Defendant's accommodation policy requires an IEP, or all the information contained in the IEP, N.K. will be unable to participate in any present or future YMCA activities. (Compl. ¶ 14) Plaintiffs contend that Defendant's conduct of requiring an IEP for disabled individuals to participate in its programs constitutes discrimination based on disability in violation of the ADA. (*Id.* at ¶¶ 15-21) Plaintiffs ask the Court to enter judgment against Defendant preventing Defendant from having a policy requiring IEPs and other unnecessary information before providing accommodations to disabled persons. (*Id.* at Request for Relief) Both parties have filed motions for summary judgment, asserting that no genuine issue of material fact exists, and therefore each party is entitled to judgment as a matter of law

## II. Legal Standards

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court show "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 775 (8th Cir. 1995).

5

The moving party has the initial burden to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ .P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). In fact, the non-moving party must present sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. Self-serving, conclusory statements, standing alone, are insufficient to defeat a well-supported motion for summary judgment. *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1191 (8th Cir. 1995). "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (citation omitted).

## III. Discussion

Both parties have filed motions for summary judgment in this case, claiming that a genuine issue of material fact does not exist and that each is entitled to judgment as a matter of

6

law. Defendant contends that Plaintiffs are unable to establish a prima facie case of disability discrimination under Title III of the ADA. Plaintiffs, on the other hand, assert that Defendant's conduct directly violates, and continues to violate, the ADA such that summary judgment should be granted in favor of Plaintiffs, and the Court should enjoin Defendant YMCA from barring N.K. and others from summer camp based on its IEP policy.

Title III of the Americans with Disabilities Act prohibits discrimination by public accommodations and provides, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). To establish a claim under Title III, the person alleging disability must show that:

(1) [he] is disabled within the meaning of the ADA, (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) the defendant took adverse action against the plaintiff based upon [his] disability, and (4) the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation.

*Woods v. Willis*, 400 F. Supp. 2d 1145, 1161 (E.D. Mo. 2005) (citations omitted).

Here, the parties agree that N.K. is disabled within the meaning of the ADA by virtue of his diagnoses of Down syndrome and Autism. Further, the parties do not dispute that Defendant YMCA is a private entity that operates a place of public accommodation. Defendant argues that Plaintiffs are unable to satisfy the third and fourth elements of prima facie case because the YMCA did not take adverse action against N.K. based on his disability and because Defendant did not fail to make reasonable modifications that would accommodate N.K.'s disability. Further, Defendant asserts that Plaintiffs' proposed modification would impose an undue burden on the YMCA and fundamentally alter the YMCA's program. Plaintiffs, on the other hand,

7

contend that Defendant's policy of requiring IEPs or their equivalent as a condition to accommodating children with disabilities is discriminatory. Plaintiffs also argue that Defendant refused to make a reasonable modification to its IEP policy and that Plaintiffs' proposed modifications would not fundamentally alter Defendant's summer camp program.

Upon thorough review of the cross-motions for summary judgment and related memoranda and exhibits, the Court finds that summary judgment in favor of Defendant is warranted. First, the evidence demonstrates that the YMCA did not discriminate against N.K. based on his disability. While Ms. Koester contends that the YMCA must demonstrate the necessity of its IEP policy, this demonstration is required only where a policy constitutes eligibility criteria that screens out, or tends to screen out, disabled individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(i). Plaintiffs rely on the Americans with Disabilities Act Title III Technical Assistance Manual regarding unnecessary inquiries into the existence of a disability. Plaintiffs assert that the YMCA discriminated against N.K. on the basis of his disability by asking for his IEP as a condition to accommodate children with disabilities. As an illustration, the manual states:

> A private summer camp requires parents to fill out a questionnaire and to submit medical documentation regarding their children's ability to participate in various camp activities. The questionnaire is acceptable if the summer camp can demonstrate that each piece of information requested is needed to ensure safe participation in camp activities. The camp, however, may not use this information to screen out children with disabilities from admittance to the camp.

American with Disabilities Act ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities, § III-4.1300, *available at* http://www.ada.gov/taman3.html. Plaintiffs' reliance on this provision and on the ADA statutory provision related to screening is misplaced in this instance. Here, there is no evidence even suggesting that the YMCA sought IEP information to screen out N.K. or any other children with

8

disabilities from admittance to the YMCA summer camp. To the contrary, the YMCA's policy is to be inclusive of those with disabilities and seek information to best accommodate them so they can participate safely in camp activities. The Court finds the YMCA's request for an IEP or its equivalent was not meant to screen out N.K. for admission to camp but to properly accommodate him so he could successfully attend the summer camp program.

"The 'screen out' concept 'makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish an individual's chances of such participation." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 518 (D.N.J. 2000) (quoting *Gukenberger v. Boston Univ.*, 974 F. Supp. 106, 134 (D. Mass. 1997) (internal quotation omitted)). In *Emery v. Caravan of Dreams, Inc.*, 879 F. Supp. 640 (N.D. Tex. 1995), the court found that the term "criteria":

> implies the necessity of making a judgment, and because judging is necessarily an active rather than a passive endeavor, the Court views [42 U.S.C. § 12182(b)(2)(A)(i)] as applying only to those rules or polices that could be used to make a specific or conscious decision as to whether or not to permit an individual or individuals to have access to goods, services, facilities, privileges, advantages, or accommodations which are being offered . . . .

*Id.* at 643-44. The *Emery* court noted that the Department of Justice commentary stated that a violation of Title III of the ADA would occur where a policy would "'bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater, or limit the seating of individuals with Down's syndrome to only particular areas of a restaurant.'" *Id.* at 644 (quoting 28 C.F.R. Pt. 36, App. B, p. 605). Here, the IEP policy does not bar N.K. or any other child from accommodation or participation. Completion of the application process is not the same as participation in the program. The policy does not determine who has access to the YMCA programs but how best to accommodate all children with disabilities. In short, the YMCA never refused to accommodate N.K.; it merely

9

refused to accommodate Ms. Koester's desire to enroll N.K. without information necessary to evaluate and provide accommodations. Plaintiffs acknowledge in the reply brief in support of their summary judgment motion that their issue with the YMCA is that the policy prevents children with disabilities, or their parents, **who object to the policy as unfairly intruding on their privacy** from participating in summer camp. (Pls.' Reply in Further Support of Their Mot. for Summ. J. p. 6, ECF No. 156) (emphasis added) Thus, the objection by Ms. Koester, and not the IEP policy itself, is what has prevented N.K. from enrolling in camp. Further, Plaintiffs do not argue that the IEP would not be helpful in accommodating N.K. but that, in their opinion, it is not necessary. Thus, the Court finds that enforcement of the IEP policy is not an adverse action and does not constitute unlawful eligibility criteria that screens out individuals on the basis of their disabilities.

However, even if the IEP policy is eligibility criteria for camp admission, Defendant has shown that such policy is necessary. The purpose of the YMCA's requirement that an applicant submit an IEP is to better accommodate children with disabilities. This policy is applied to all camp applicants and enables the YMCA to successfully accommodate more than 700 children with disabilities each summer. Using this IEP to better understand N.K.'s disabilities and accommodate his special needs, as the YMCA does for all children with disabilities applying to summer camp, helps to properly accommodate disabled children and keep them, and other children, safe. For example, in *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 427 F.3d 1326 (10th Cir. 2005), the court determined that the enforcement of the "lift and care for a camper rule" for camp counselors did not amount to unlawful discrimination under Title III of the ADA. *Id.* at 1333. In that case, plaintiffs with muscular dystrophy who were denied the opportunity to serve as volunteer counselors at a summer camp run by the Muscular Dystrophy Association claimed

10

that the policy requiring all volunteers to be able to lift and care for campers constituted discrimination in violation of the ADA. *Id.* at 1327. The court disagreed, finding that the eligibility criteria were necessary for the safe operation of the camp and the provision of privileges and advantages of the camp to beneficiaries of the camp. *Id.* at 1332.

Plaintiffs attempt to equate Title I, related to employment, with Title III, related to places of public accommodation for the proposition that the request for the IEP is intrusive and unnecessary. Title I prohibits employers from inquiring into the nature or severity of the disability unless the employer can show it is job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (noting that under Title I, the employer bears the burden to show that the alleged business necessity is vital to the business and the inquiry is "no broader or more intrusive than necessary"). Plaintiffs cite no Eighth Circuit law to support their proposition that the Court should apply this same standard to N.K.'s desire to participate in summer camp at the YMCA.[1] Further, the YMCA correctly notes that the IEP is not used to determine the existence of a disability but to enable it to accommodate children with disabilities to allow participation in the summer camp program. Thus, the Court finds that the YMCA has demonstrated that its IEP policy is necessary to adequately provide appropriate accommodations to disabled participants.

The evidence also demonstrates that Defendant did not refuse to make a reasonable modification. To comply with the fourth requirement of Title III of the ADA, "an individualized inquiry must be made to determine whether a specific modification for a particular person's

---

[1] Plaintiffs assert that courts "routinely rely on Title I cases where Title III case law is less developed. The case upon which Plaintiffs rely, *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997) is from a different circuit and nearly 20 years old. Case law in Title III cases is sufficiently developed such that the Court need not apply Title I ADA standards pertaining to employment to those ADA cases pertaining to the enjoyment of services by disabled persons in public places of accommodation under Title III.

11

disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). Here, Plaintiffs maintain that Ms. Koester's offer to sit down with the YMCA and provide the necessary information was a reasonable modification. In response to Plaintiffs' modification request, Defendant's counsel sent a letter expressing a willingness to allow N.K. to participate in future summer camps if N.K.'s pediatrician submitted information regarding N.K.'s disability and needs for accommodations. Ms. Koester found this to be unreasonable and instead filed a law suit. However, Plaintiffs have failed to meet their burden of demonstrating they requested a reasonable specific modification to the YMCA's IEP policy. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) (finding plaintiff's vague assertions that he sent letters and made phone calls requesting accommodations to be too general and conclusory to demonstrate that he requested reasonable specific accommodations or that the defendant unreasonably failed to provide every requested accommodation).

Additionally, the information Ms. Koester would have provided, and later did provide, contradicted the information provided by Dr. Plax. While Ms. Koester stated that N.K. had no speech or behavioral issues that would require special accommodation and that N.K. merely needed an extra set of eyes, the evidence demonstrates that N.K. required a speech and occupational therapist, as well as one-on-one supervision when in a school setting with other students. Additionally, both Dr. Plax and YMCA employee Ms. Jimas testified that N.K. had difficulty with verbal expression and had behavioral problems.

Plaintiffs' reliance on *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299 (1st Cir. 2003) is misplaced. In *Dudley*, a retailer refused to sell alcohol to a disabled person whose symptoms mirrored the traits of intoxication. *Id.* at 301. The plaintiff explained the reason for his behavior

12

after the cashier would not sell alcoholic beverages to the plaintiff, but the manager denied plaintiff's request to reconsider, relying on the store's strict rule prohibiting managers from reversing a cashier's decision not to sell alcohol to a customer. *Id.* at 302. The retailer argued that the requested modification, to prohibit merchants from following a strict "refusal to reconsider" policy, was unworkable and "would force retailers to sell alcoholic beverages to inebriated individuals who claim to be disabled." *Id.* at 309. The court agreed that the defendant had a legitimate health and safety concern but noted, "striking a reasonable balance between avoiding health and safety risks, on the one hand, and protecting persons with disabilities from discrimination, on the other hand, is an exercise that lies at the core of Title III determinations." *Id.* The court found that, while the bright line rule offered certain administrative efficiencies, an individualized inquiry was "precisely what the ADA require[d]." *Id.* at 310. The court thus held, "when an individual claims to be disabled and presents some evidence supporting that claim, the proprietor of a place of public accommodation does not satisfy its obligations under Title III of the ADA by refusing to consider that proffer . . . ." *Id.* at 310.

*Dudley* is inapposite to the facts of this case. First, whether N.K. is disabled is not at issue in this case. Further, while the retailer in *Dudley* refused to modify its policy despite the plaintiff's request that it reconsider based on plaintiff's disability, the YMCA did not refuse to modify its IEP policy. Contrary to Plaintiffs' position, the YMCA did offer to work with Ms. Koester to modify the policy and find alternate means of obtaining adequate information to accommodate N.K. Specifically, the YMCA sought objective third-party information regarding N.K.'s needs in order to adequately accommodate him during summer camp. Again, Ms. Koester took the position that any specific information from sources other than her was intrusive. While she insists that her offer to engage in an individualized, interactive process was a

13

reasonable modification, the evidence shows that Ms. Koester's perception of N.K.'s needs stemming from his disability vastly differed from other sources of information. Thus, her request to sit down and engage in an interactive process was neither reasonable, nor would it have provided the Defendant with sufficient information to adequately accommodate N.K.[2] Further, the policy in *Dudley* excluded disabled persons from purchasing alcohol, whereas the YMCA's IEP policy allows disabled children to be included in its summer camp programs.

Finally, the evidence demonstrates that, even if Plaintiffs established that a reasonable modification existed, this modification would fundamentally alter the YMCA's summer camp program. As stated above, the court must strike a balance between avoiding health and safety risks and protecting persons with disabilities from discrimination. *Id.* at 309. Here, Plaintiffs' proposed modification to sit down and have an interactive process with no requirement for objective information regarding disabled campers' specific disabilities and accommodation needs would increase risks to YMCA campers and would impose undue financial and administrative burdens on the YMCA. The purpose of the IEP policy is to accommodate children, keep them safe, and keep other children safe to ensure that each child has fun and reaches his or her maximum potential at the YMCA. By assessing a child's accommodation needs based solely on a parent's subjective word, the YMCA could be putting campers at physical risk and would increase the YMCA's risk of liability. (Def.'s SUMF ¶ 19); *Bauer,* 427 F.3d at 1331-32 (finding that altering camp's policy that volunteers be able to lift and care for campers "would require MDA to incur significant costs, would increase risks to its campers,

---

[2] Although Plaintiff argues that the IEP information related to N.K.'s education was not relevant, the questions asked by Defendant's attorney, while part of N.K.'s IEP, was related to information needed to accommodate N.K. and not the allegedly "unnecessary" academic information contained in the IEP. (Def.'s Ex. G p. 2, ECF No. 127-8; Pls.' Reply in Further Support pp. 7-8, ECF No. 156)

14

increase risk of liability, and shift resources away from the intended beneficiaries of the camp to the counselors who are there for the purpose of assisting campers."). Further, the IEP is already available to parents and prevents the YMCA from going to the time and expense of sitting down with each parent to determine which accommodations are appropriate. (Def.'s SUMF ¶¶ 110-112); *Roberts By & Through Rodenberg-Roberts v. KinderCare Learning Centers, Inc.,* 86 F.3d 844, 846 (8th Cir. 1996) (finding that requiring the Center to provide one-on-one care would impose an undue financial burden by requiring the Center to employ a full-time caregiver for the disabled child). Thus, Plaintiffs' accommodation request was unreasonable and would have imposed an undue burden on the YMCA and fundamentally altered its summer camp program. Based on the foregoing, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' Complaint for Injunctive Relief under Title III of the Americans with Disabilities Act.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 125) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 129) is **DENIED.** A separate Judgment will accompany this Memorandum and Order.

Dated this 5th day of February, 2016.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**